**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **GENEVIEVE CAPOLONGO**, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>**SPOTIFY USA INC.,**<br><br>        Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     Plaintiff Genevieve Capolongo, like millions of other Spotify subscribers, turned to the platform for what it promised: a personalized listening experience built around her own tastes.

2.     For years, she created playlists, discovered new artists, and trusted that the songs recommended to her reflected her preferences, not hidden commercial influence. But as she kept hearing the same major-label tracks and "personalized" playlists that bore little resemblance to her listening habits, she began to realize something was wrong.

3.     Her experience reflects a broader problem with the platform. Spotify, the world's largest music streaming service, has revived the industry's oldest deception—pay-for-play—in a modern, algorithmic form.

4.     This deception is not new. For over a century, the music industry's gatekeepers— from vaudeville promoters to radio DJs—have secretly taken payments to promote certain songs, a practice known as "payola." Each time regulators caught on—in the 1930s, 1960s, and again in the 2000s—they moved to stop it, recognizing undisclosed pay-for-play as deceptive and unlawful.

5.     Spotify's "Discovery Mode" and purportedly organic curated playlists represent the latest form of payola in the industry's long history of deceptive pay-for-play.

6.     Yet, Spotify's version of payola stands out still. Unlike the DJs and promoters of old, Spotify charges listeners for the privilege of being deceived—$11.99 per month for an individual plan, to be exact.

7.     Consumers pay for Spotify because it promises something worth paying for: music recommendations tailored to their own tastes. Spotify advertises playlists "made just for you," alongside editorial lists that purport to showcase what's new, popular, and culturally relevant.

8.    Like every generation before them, today's listeners care deeply about authenticity in music. And in the streaming era, that authenticity takes the form of personalization. Users invest time and attention—saving and skipping songs, building playlists, and following artists—to help Spotify's algorithm "learn" their preferences.

9.    Spotify exploits that trust by marketing itself as a platform that offers organic music recommendations—whether through its algorithmic or curated playlists—only to secretly sell those recommendations to the highest bidder.

10.    Plaintiff brings this action on behalf of a nationwide class of Spotify users to put an end to this modern form of payola, secure restitution and damages for consumers, and obtain injunctive relief requiring Spotify to disclose when commercial incentives drive playlist placement.

## JURISDICTION AND VENUE

11.    This Court has personal jurisdiction over Defendant because Spotify USA Inc. is headquartered in New York, and Defendant conducts and continues to conduct substantial business in this State, and Defendant committed and continues to commit the acts and omissions complained of herein in this District.

12.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), as the Class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from Defendant and seeks in the aggregate more than $5 million exclusive of costs and interest.

13.    Venue is proper in this District under 28 U.S.C. § 1391 because Spotify USA Inc. maintains its principal place of business in this District, and a substantial portion of the events giving rise to this action occurred in this District.

## PARTIES

14.    Plaintiff Genevieve Capolongo is, and at all times mentioned herein was, an individual citizen of the State of New York. At all material times, she was a resident of New York, New York, where she purchased her Spotify subscriptions and used the service.

15.    Defendant Spotify USA Inc. is a Delaware corporation with its principal place of business at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007. Spotify USA Inc. is the U.S. operating arm of the world's largest music streaming service.

## FACTUAL ALLEGATIONS

*"History doesn't repeat itself, but it often rhymes."*
-Mark Twain

**I.    A History of Payola: The Endless Cycle of Scandal and Reform.**

**A.    The Origins: Vaudeville, Sheet Music, and the Birth of Payola.**

16.    Payola is the practice of paying someone a sum of money (or other consideration) to promote a piece of music in the hopes of gaining exposure to a wider audience and increasing sales and profits.[1]

17.    Although the term "payola" wasn't coined until 1938, the practice itself reaches back to the late nineteenth century, during the vaudeville era.[2] At that time, publishers made their money selling sheet music, and audiences discovered new songs at vaudeville shows or dance halls.[3] To drive sales, publishers hired "song-pluggers" who paid performers to feature their music.

---

[1] Kerry Segrave, Payola in the Music Industry: A History, 1880–1991, at vii (1994).

[2] *Id*. at 1.

[3] *Id*. at 5-21.

The payments weren't always direct cash—sometimes the performer was given a lucrative arrangement fee, or even a share of royalties.[4]

18.    The practice sparked outrage almost immediately. By the 1890s, publishers began organizing collective efforts to stamp it out.[5] By 1917, the newly formed Music Publishers Protective Association ("MPPA") formally banned the use of paid song-pluggers.[6] In 1931, the American Society of Composers, Authors, and Publishers ("ASCAP") also banned the practice.[7]

19.    Congress took it further in 1933 when the National Recovery Administration ("NRA") prohibited undisclosed payola in the Code of Fair Competition for the music industry— though the code was short-lived after the Supreme Court struck down the NRA as unconstitutional.[8] A few years later, the Federal Trade Commission took up the mantle, pressuring industry groups to denounce payola and condemning the practice as bribery and fundamentally deceptive.[9]

**B.    The First Radio Scandal: The Rise of Radio DJs and Disclosure Rules.**

20.    The rise of radio in the 1930s shifted the gatekeepers. Audiences no longer discovered songs on vaudeville stages but on the radio. By the 1950s, influential DJs like Alan Freed and Dick Clark held extraordinary sway—able to turn a single record into a national hit with a single spin.[10]

---

[4] *Id.* at 34-35; *see also* R. H. Coase, *Payola in Radio and Television Broadcasting*, 22 J.L. & ECON. 269, 270 (1979).

[5] Coase, *supra* note 4 at 273, 276; *see also* Segrave, *supra* note 1 at 16.

[6] *Id.*

[7] Segrave, *supra* note 1 at 16.

[8] *Id.* at 41; *see also* National Industrial Recovery Act (NIRA) of 1933, Pub. L. No. 73-67, U.S.C.C.A.N. (48 Stat.) 195, *invalidated by A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).

[9] Payola, *History of Rock*, https://www.history-of-rock.com/payola.htm, (last visited October 16, 2025).

[10] Coase, *supra* note 4 at 286-87.

21.    Naturally, payola adapted. Record companies and publishers began paying DJs directly: small-market DJs might earn $25–$50 a week (roughly $330–$660 today), while prominent figures took in staggering sums.[11] One DJ admitted to pocketing $12,000—about $138,000 in today's dollars—in 1958 for "listening fees."[12]

22.    Once again, the public and industry insiders recoiled. The FCC had rules requiring disclosure of paid promotions, but it lacked jurisdiction over DJs themselves, leaving enforcement toothless.[13] Throughout the 1940s and 1950s, industry groups tried to curtail the practice, but it persisted.[14]

23.    By 1959, the public disgust had boiled over: the New York District Attorney, the FTC, the FCC, and the House of Representatives each launched investigations.[15] The FTC charged stations with unfair and deceptive practices, arguing undisclosed payola misled the public and distorted competition.[16]

24.    The 1960 congressional Payola Hearings cemented the backlash. Lawmakers branded payola as "bribery," "immoral," "reprehensible," and against the public interest.[17] Their solution was to amend the Communications Act of 1934, formally bringing payola under the FCC's

---

[11] Segrave, *supra* note 1 at 80-84.

[12] *The Payola Scandal Heats Up*, History.com, (Last Updated May 27, 2025), https://www.history.com/this-day-in-history/february-11/the-payola-scandal-heats-up, (last visited October 16, 2025).

[13] Coase, *supra* note 4 at 296.

[14] Maria A. Pallante, *ASCAP* at 100, 61 J. Copyright Soc'y U.S.A. 545 (2014); Peter DiCola & Matthew Sag, *An Information-Gathering Approach to Copyright Policy*, 34 Cardozo L. Rev. 173, 182 (2012).

[15] Segrave, *supra* note 1 at 107-15.

[16] Kasi Wautlet, *Playlists as Endorsements: An Argument for Continued Payola Regulation in the Internet Age*, 76 N.Y.U. Ann. Surv. Am. Law 821, at 827 (2021) (citing *Responsibilities of Broadcasting Licensees and Station Personnel: Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on Payola and other Deceptive Practices in the Broadcasting Field*, 86th Cong. 640, at 829-30 (1960)).

[17] Coase, *supra* note 4 at 295.

jurisdiction and making nondisclosure a misdemeanor punishable by fines up to $10,000, imprisonment for a year, or both.[18]

**C.    The Second Radio Scandal: Indies, Consolidation, and Crackdowns.**

25.    For a time, this regulation seemed effective. But by the late 1970s, major record labels found a workaround.

26.    In 1979, the FCC carved out the so-called "friendship exception," ruling that "social exchanges between friends are not payola."[19] Almost immediately, a new form of payola flourished: major record labels began channeling payments through independent promoters, or "indies," who funneled money to radio stations while insulating the labels from liability.[20]

27.    At the same time, the role of local DJs diminished. Programming decisions shifted upward to station executives, who could coordinate with indies to determine playlists across entire markets.[21]

28.    The Telecommunications Act of 1996 compounded the problem, driving consolidation that created powerful new radio conglomerates with unprecedented leverage to cut national promotional deals with record labels.[22] This new structure allowed "friendly" payola to thrive.[23]

---

[18] *Id.*; *see also* 47 U.S.C. § 317(a)(1) (1960).

[19] Christopher Buccafusco & Ramón Ryan García, *Pay-to-Playlist*, 12 U.C. Irvine L. Rev. 551 (2022) (citing *Dena Pictures, Inc. et al, Memorandum Opinion and Order*, 71 FCC 2d 1402, 1408 (1979)).

[20] Marie Connolly and Allan B. Krueger, *Rockonomics: The Economics of Popular Music*, 46 (Nat'l Bureau of Econ. Research, Working Paper No. 11282, 2005).

[21] Lorne Manly, *How Payola Went Corporate*, New York Times (July 31, 2005), https://www.nytimes.com/2005/07/31/weekinreview/how-payola-went-corporate, [https://perma.cc/C4SR-Y5FD] (last visited October 14, 2025).

[22] *Id.*

[23] Chuck Philips & Michael A. Hiltzik, *Radio Conglomerates Skirt Payola Laws, Critics Say*, Los Angeles Times, (Dec. 16, 1998), https://www.latimes.com/archives/la-xpm-1998-dec-16-mn-54616-story.html (last visited October 16, 2025).

29.    The public again responded with disgust. In 2003, during the FCC's review of the Telecommunications Act, it received more than 15,000 complaints mostly opposing consolidation and lamenting the homogenization of radio playlists.[24]

30.    A year later, New York Attorney General Eliot Spitzer launched an investigation into major labels and broadcasters under New York's Deceptive Practices Statute—not federal payola laws.[25] His probe resulted in several multi-million-dollar settlements and reignited FCC enforcement, which soon issued its own fines and consent decrees against the largest radio conglomerates.[26]

**D.    The Streaming Revolution and the New Era of Gatekeepers.**

31.    Just as regulators were clamping down on payola on the radio again, the music industry experienced a seismic shift: the rise of streaming.

32.    Streaming platforms, like Spotify, promised listeners unprecedented access to vast libraries of songs and the freedom to choose what they wanted to hear.[27] Instead of a handful of DJs or station executives deciding what songs reached the public, consumers could now search an almost infinite library of tracks on demand. By 2018, streaming services accounted for nearly three-quarters of recorded music revenue, eclipsing both radio and physical sales. Paid

---

[24] Mary Madden, *The State of Music Online: Ten Years after Napster*, Pew Research Center: Internet and Technology, (June 15, 2009), https://www.pewinternet.org/2009/06/15/the-state-of-music-online-ten-years-after-napster/ (last visited October 16, 2025).

[25] *See, e.g.*, Press Release, Att'y Gen. of the State of New York, Sony BMG Music Entertainment, Assurance of Discontinuance Pursuant to Executive Law § 63(15)7 (July 2005), https://ag.ny.gov/sites/default/-files/press-releases/archived/payola.pdf, [https://perma.cc/F39F-ZULF] (last visited October 9, 2025); *see also* Press Release, Att'y Gen. of the State of New York, Universal Music Settles Payola Probe (May 11, 2006), https://ag.ny.gov/press-release/universal-music-settles-payola-probe, [https://perma.cc/RR3Q-H488 ] (last visited October 9, 2025).

[26] *Id*.

[27]    Spotify,    Premium    (U.S.),    Spotify,    https://www.spotify.com/us/premium/?ref=spotifycom_header_-premium_individual (last visited October 16, 2025).

subscriptions quickly became the industry's engine, generating $4.7 billion in 2018 alone—47.3% of all recorded music revenue.[28]

33.    Yet the abundance of choice created a new problem: oversaturation. With over 70 million songs on the Spotify platform—and more than 60,000 songs uploaded every day—listeners could not possibly navigate the flood of content on their own.[29] As in every earlier era of payola, new gatekeepers emerged to filter and recommend music: editors of playlists.[30]

34.    Playlists quickly became the primary way listeners discovered new music—occupying the same role that radio DJs once held.[31] Surveys show that the majority of Spotify users report finding new songs and artists through playlists, far outpacing any other form of promotion.[32]

35.    Placement on a flagship playlist could launch an artist's career, generating millions of streams and hundreds of thousands of dollars in royalties.[33] In effect, the modern playlist became the functional equivalent of the radio spin: a signal of quality and popularity that consumers trusted.

---

[28] U.S. Recorded Music Revenues by Format, Recording Industry Association of America, https://www.riaa.-com/u-s-sales-database/, [https://perma.cc/LNM2-QHVV] (last visited October 9, 2025).

[29] Tim Ingham, *Over 60,000 Tracks Are Now Uploaded to Spotify Daily — That's Nearly One Per Second*, Music Business Worldwide, (May 3, 2024), https://www.musicbusinessworldwide.com/over-60000-tracks-are-now-uploaded-to-spotify-daily-thats-nearly-one-per-second/ (last visited October 16, 2025).

[30] Maria Eriksson, *The Editorial Playlist as Container Technology: On Spotify and the Logistical Role of Digital Music Packages*, 13 J. Cultural Econ., 415, 416 (2020)

[31] Patrick McGuire, *Why Playlists are More Important than Ever*, TuneCore Blog (Dec. 5, 2017), https://www.tunecore.com/blog/2017/12/playlists-important-ever.html, [https://perma.cc/52YE-8XZS] (last visited October 13, 2025).

[32] Eric Drott, *Why the Next Song Matters: Streaming, Recommendation, Scarcity*, 15 Twentieth-Century Music 325, 331 (2018).

[33] Luis Aguiar & Joel Waldfogel, *Platforms, Promotion, and Product Discovery: Evidence from Spotify Playlists* 4 (Nat'l Bureau of Econ. Rsch., Working Paper No. 24713, 2018) https://www.nber.org/system/files/working_papers/w24713/w24713.pdf (last visited October 16, 2025).

36.     This shift was not lost on the industry. Just as radio DJs once held the keys to stardom, Spotify's playlists became the new bottleneck—and with them came new opportunities for manipulation. And as in every earlier era of payola, those who controlled what music consumers heard quickly became targets of payola.

**II.     Spotify's Playlists as the New Gatekeepers.**

37.     Spotify, as the dominant streaming service, sits at the center of this new system. With more than half a billion users worldwide, its playlists are not just popular—they are the primary way listeners discover music. Surveys confirm that a majority of Spotify users report finding new songs and artists through playlists, far surpassing the radio, blogs, or social media.[34]

38.     Spotify offers two principal types of playlists: (1) ***editorial playlists***, hand-curated by editors employed by Spotify; and (2) ***algorithmic playlists***, generated through Spotify's proprietary recommendation engine. Both wield immense influence.

39.     Spotify's editorial lists are among the most influential in the industry. For example, *Rap Caviar*—Spotify's premier hip-hop playlist, curated by Carl Chery—boasts over 15 million followers.[35] *Today's Top Hits*, curated by J.J. Italiano, has over 35 million followers and ranks as one of the most-followed playlists in the world. These Spotify-employed curators exercise significant influence by deciding which tracks appear and in what order.[36]

---

[34] McGuire, *supra* note 31.

[35] *RapCaviar*, Spotify, https://open.spotify.com/playlist/37i9dQZF1DX0XUsuxWHRQd (showing over 15 million followers) (last visited October 16, 2025); *see also* Jonathan Monovich, *Music to Film Streaming: Interview with Carl Chery on the Hulu Docuseries* RapCaviar Presents, Film International (Mar. 31, 2023), available at https://filmint.nu/interview-with-carl-chery-on-the-hulu-docuseries-rapcaviar-presents-jonathan-monovich (last visited October 16, 2025).

[36] *Today's Top Hits*, Spotify, https://open.spotify.com/playlist/37i9dQZF1DXcBWIGoYBM5M, (showing over 35 million followers); *see also* Lauren Kranc, *Meet the Guy Behind the World's Biggest Playlists*, Esquie, (Mar. 14, 2024), available at https://www.esquire.com/entertainment/music/a60179700/jj-italiano-spotify-playlist-curator-interview (last visited October 13, 2025); *Spotify Head of Urban Music Carl Chery Invites Fans to Look into the Stories of Hip-Hop's Top Artists with "RapCaviar Presents,"* Spotify (Mar. 24, 2023), https://newsroom.spotify.com/2023-03-

40.    The algorithmic playlists, by contrast, are powered by Spotify's massive data-collection system.[37] The company tracks users' listening history—including which songs they follow, skip, repeat, or "like," and how long they listen—to feed into a proprietary algorithm that recommends songs to each listener. Spotify's algorithmic playlists include Spotify Radio, Daily Mix, Release Radar, Discover Weekly, and its AI-driven DJ.[38]

41.    Placement on either type of playlist carries enormous commercial value. Inclusion on a flagship playlist instantly exposes an artist to millions of potential listeners searching for new music. At the same time, the increased streams directly translate into royalties. For example, placement on *Today's Top Hits* alone is estimated to boost streams by nearly 20 million—generating between $116,000 and $163,000 in royalties.[39]

42.    Spotify also wields power by controlling which playlists receive the most visibility. Researchers have shown that playlists placed on Spotify's Discover Page enjoy roughly a 1% boost in listeners compared to identical playlists buried deeper in the platform.[40] This selective promotion confirms industry concerns: Spotify can favor some producers and labels over others not just through editorial or algorithmic choices, but also by manipulating platform placement itself.

---

24/spotify-head-of-urban-music-carl-chery-invites-fans-to-look-into-the-stories-of-hip-hops-top-artists-with-rapcaviar-presents (last visited October 21, 2025).

[37] *See Types of Spotify Playlists*, Spotify for Artists, https://artists.spotify.com/help/article/types-of-spotify-playlists?category=promos-and-playlists (last visited October 13, 2025).

[38] *Id.*

[39] Luis Aguiar & Joel Waldfogel, Platforms, *Promotion, and Product Discovery: Evidence from Spotify Playlists* 4 (Nat'l Bureau of Econ. Rsch., Working Paper No. 24713, 2018), https://www.nber.org/system/files/working_papers/w24713/w24713.pdf (last visited October 16, 2025).

[40] Max J. Pachali & Hannes Datta, *What Drives Demand for Playlists on Spotify?*, 44 Marketing Sci. 54, 62 (2025).

III.    **Spotify's Pay-for-Play Scheme.**

43.    With playlists functioning as the new cultural chokepoint, it did not take long for payola to re-emerge in a modern form. Just as labels once courted radio DJs with cash, gifts, and favors, industry insiders now describe similar tactics aimed at Spotify's curators and algorithmic systems. Placement on a high-profile playlist is so commercially valuable that labels and managers treat access as a commodity—one worth hundreds of thousands of dollars per track.

44.    Although Spotify formally prohibits undisclosed pay-for-play, the reality on the ground mirrors the scandals of past decades.[41]

45.    Industry insiders admit that pay-for-play "is definitely happening" on streaming services.[42] Sources report that placement of a song can cost between $2,000 for playlists with modest followings and $10,000 for the largest.[43] Other payments are disguised as "consultancy fees" of $100 to $150 to ensure tastemakers hear a track, framed as advice rather than pay-for-play.[44] Independent artists without major-label backing lack the same access or assurances that their music will ever be heard.[45]

---

[41] *Artificial streaming and paid 3rd-party services that guarantee streams*, Spotify, https://support.spotify.com/us/artists/article/third-party-services-that-guarantee-streams/ (last visited October 16, 2025).

[42] Adam Sherwin, *Payola: One of music's oldest arrangements back with a bang on streaming playlists*, The Independent (Aug. 20, 2015), https://www.the-independent.com/arts-entertainment/music/news/payola-one-of-music-s-oldest-arrangements-back-with-a-bang-on-streaming-playlists-10464513.html (last visited October 16, 2025).

[43] *Id.*

[44] *Id.*

[45] Liz Pelly, *Pay to get playlisted? The accusations against Spotify's Discovery Mode*, The Guardian (Feb. 19, 2025), https://www.theguardian.com/music/2025/feb/19/spotify-discovery-mode-payola-playlist (last visited October 16, 2025).

46.     Abroad, regulators have investigated outright bribery of Spotify editors,[46] while in the United States, lawsuits have alleged sweetheart deals designed to tilt visibility in favor of certain artists.[47]

47.     Major record labels also exploit their structural leverage to obtain preferential treatment. UMG's CEO has publicly boasted that partnering with the label "dramatically increases the odds" of global success for its artists.[48]

48.     And independent researchers confirm that major-label tracks appear on Spotify's most popular playlists at a disproportionately higher rate, with their dominance amplified by recommendation engines.[49]

49.     This advantage stems from the fact that labels control vast catalogs that streaming platforms need to survive. In turn, labels are able to extract concessions such as preferential algorithmic placement.[50] Indeed, when Spotify was still an start-up in 2008, the Big Three labels

---

[46] Ashley King, *Spotify Investigating Playlist Bribery Allegations in Turkey; Reports Say Multiple Employees Involved*, Digital Music News (Aug. 12, 2025), https://www.digitalmusicnews.com/-2025/08/12/spotify-playlist-bribery-allegations-turkey/ (last visited October 16, 2025).

[47] Murray Stassen, *Drake Files Another Legal Petition Over 'Not Like Us,' Accuses Universal of Inappropriate Business Practices Including a Payola Scheme to Turn Kendrick Lamar's Diss Track Into a Mega-Hit*, Music Business Worldwide (Jan. 15, 2025), https://www.musicbusinessworldwide.com/drake-files-another-legal-petition-over-not-like-us-accuses-universal-of-inappropriate-business-practices-including-a-payola-scheme-to-turn-kendrick-lamars-diss-track-into-a-mega-hit/ (last visited October 16, 2025).

[48] Murray Stassen, *Read Sir Lucian Grainge's 2022 Message to Universal Music Group's Workforce*, Music Business Worldwide (Jan. 12, 2022), https://www.musicbusinessworldwide.com/read-sir-lucian-grainges-2022-message-to-universal-music-groups-workforce1/ (last visited October 16, 2025).

[49] Peter Knees et al., *Bias and Feedback Loops in Music Recommendation: Studies on Record Label Impact*, in Proceedings of the MORS Workshop at ACM RecSys'22 (2022), https://ceur-ws.org/Vol-3268/paper6.pdf, (last visited October 16, 2025); *see also* Digital, Culture, Media and Sports Committee, *Economics of Music Streaming*, 2021-2, HC 50-2 71, at 69 (U.K.).

[50] Micah Singleton, *This Was Sony Music's Contract with Spotify: The Details the Major Labels Don't Want You to See*, The Verge (May 19, 2015), https://www.theverge.com/2015/5/19/8621581/sony-music-spotify-contract (last visited October 16, 2025).

secured equity stakes—Sony at 6%, Universal at 5%, Warner at 4%, and EMI at 2%—as part of licensing negotiations.[51]

50.     Spotify further institutionalized its pay-for-play in 2020 through its "Discovery Mode," its most brazen payola to date.[52] Discovery Mode allows artists and labels to boost the visibility of selected tracks on algorithmic playlists, Autoplay, and Radio, but only if they accept reduced royalty rates.[53] Instead of cash up front, participants "pay" with lower per-stream payouts. Realistically, only the most entrenched major record labels can afford this trade-off.[54]

51.     Critics call Discovery Mode what it is: modern payola.[55] Listeners are never told when a track has been promoted through the program, creating the false impression of neutral, personalized recommendations when financial incentives are quietly driving the algorithm. The program has been condemned by artist advocates, denounced in the press, and even prompted a Congressional inquiry.[56]

## IV.     Spotify's False Promise of Personalization.

52.     Spotify's pay-for-play practices are deceptive in their own right. But Spotify compounds that deception by aggressively marketing its playlists as neutral and personalized.

---

[51] Tim Ingham, *If Universal Music Sells its Spotify Stock Right Now, Artists Get $500 Million*, Rolling Stone, https://www.rollingstone.com/pro/features/universal-music-spotify-ownership-artists-1126893/ (last visited October 16, 2025).

[52] *Does Spotify's New 'Discovery Mode' Resemble Anti-Creator Payola?*, Recording Academy (Nov. 30, 2020), https://www.recordingacademy.com/advocacy/news/does-spotifys-new-discovery-mode-resemble-anti-creator-payola (last visited October 16, 2025).

[53] *Discovery Mode*, Spotify Artists, https://artists.spotify.com/discovery-mode (last visited October 16, 2025).

[54] Pelly, *supra*, note 45.

[55] *See, e.g., Does Spotify's New 'Discovery Mode' Resemble Anti-Creator Payola?*, Recording Academy (Nov. 30, 2020), https://www.recordingacademy.com/advocacy/news/does-spotifys-new-discovery-mode-resemble-anti-creator-payola (last visited October 16, 2025); *Stop Spotify's Discovery Mode Payola*, Action Network, https://actionnetwork.org/petitions/stop-spotifys-discovery-mode-payola (last visited October 16, 2025); *Discovery Mode: A Race to the Bottom*, WIN (May 26, 2022), https://winformusic.org/discovery-mode-a-race-to-the-bottom/ (last visited October 16, 2025).

[56] *Id*.

14

53.     On its website, Spotify claims: "*It's the place to discover the perfect song for the moment.*"[57] Lower on the page, it says "*Fresh ways to discover music. . . Made for you, with you.*"[58]

54.     In describing its AI DJ, Spotify claims the "DJ spins tracks just for you."[59] It touts its Discover Weekly playlists as updating "with new music based on your personal listening habits" to help users "find new artists, tracks, and hits to fall in love with."[60]

55.     When first announcing its AI DJ, Spotify assured the public that "*Personalization is at the heart of what we do at Spotify.*"[61] It promised that the "beauty of these experiences" is the ability to deliver "the right piece of music for that exact moment in time" and "connect you with your next favorite artist."[62] Spotify further advertised that the DJ would "know you and your music taste so well that it can choose what to play for you" and would "deliver a curated lineup of music alongside commentary around the tracks and artists we think you'll like." The company represented that this DJ would constantly refresh its lineup "based on your feedback" and that "the more you listen and tell the DJ what you like (and don't like!), the better its recommendations get." Spotify summed it up as "*the very best of Spotify's personalization—but as an AI DJ in your pocket*."[63]

56.     Spotify has repeated these claims across its platform. Its support pages assure users they can "Experience your own personal DJ, a virtual assistant who recommends old favorites and

---

[57] *Spotify Premium*, Spotify, https://www.spotify.com/us/premium/ (last visited October 16, 2025).

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Spotify Debuts a New AI DJ Right in Your Pocket*, Spotify Newsroom (Feb. 22, 2023), https://newsroom.spotify.com/2023-02-22/spotify-debuts-a-new-ai-dj-right-in-your-pocket/ (last visited October 16, 2025).

[62] *Id.*

[63] *Id.*

allows you to discover new genres, playlists, and artists."[64] More recently, Spotify described its AI DJ as "like having a personal musical friend who just gets you."[65] In promotional videos with hundreds of thousands of views, Spotify boasts that its AI DJ plays "music just for you."[66]

57.     The same theme is repeated in app-store marketing, which every consumer encounters when downloading the app.[67] On both the App Store and Google Play, Spotify promises to: "Discover personalized music recommendations tailored to your unique taste"; "Enjoy personalized playlists"; "Discover personalized playlists made just for you"; "Enjoy your personal Discover Weekly playlist every week"; and experience an "AI DJ: a personalized guide that knows your music taste so well it can choose what to play for you."[68]

58.     But Spotify's promise of personalization is false. *See supra* Section III. Spotify itself concedes that "commercial considerations may influence [its] recommendations."[69] In its own words, the company "offers a promotional tool that enables artists and record labels to highlight priority songs, increasing the likelihood of them being recommended in specific algorithmic playlists—Radio, Autoplay, and certain mixes." [70]

---

[64] *DJ*, Spotify Support, https://support.spotify.com/us/article/dj/ (last visited October 16, 2025).

[65] *Spotify's DJ Now Takes Requests, Enhancing Real-Time Music Discovery*, Spotify Newsroom (May 13, 2025), https://newsroom.spotify.com/2025-05-13/dj-voice-requests/ (last visited October 16, 2025).

[66] *Introducing DJ | Spotify*, YouTube, (Feb. 22, 2023), https://www.youtube.com/watch?v=ok-aNnc0Dko (last visited October 16, 2025).

[67] *Spotify – Music and Podcasts*, Apple App Store, https://apps.apple.com/us/app/spotify-music-and-podcasts/id324684580 (last visited October 14, 2025); *see also Spotify – Music & Podcasts*, Google Play Store, https://play.google.com/store/apps/details?id=com.spotify.music&hl=en_US (last visited October 16, 2025).

[68] *Id*.

[69] Spotify App, *About Recommendations and the Impact of Promotion* (accessible within personalized playlists under "About" tab) (last visited October 16, 2025).

[70] *Id*.

59. Spotify does not disclose this fact until *after* users subscribe to the platform. Even then, the disclosure is buried deep within the interface: users must navigate into a playlist's hidden "About Recommendations" menu to find it.[71]

60. That disclosure—if ever found—does not cure the deception. Telling users that "commercial considerations may influence" recommendations does not reveal which songs are being promoted commercially and which are being recommended organically. Without that specificity, users cannot distinguish between genuine personalization and covert advertising. The disclosure is thus belated and insufficient to put reasonable users on notice that Spotify's "personalized" recommendations are influenced by commercial interests.

61. Even setting the deception aside, Spotify's business model has made true personalization impossible. The platform's systematic preference for major-label artists creates a feedback loop that amplifies their visibility and entrenches their dominance. As scholars have observed, major labels are "over-represented in the recommendation process[.]"[72] That is because placement on a curated playlist—whether editorial or algorithmic—drives streams, and the elevated stream count, in turn, increases the likelihood that the same tracks will surface on other playlists.

62. This bias is most visible on Spotify's flagship editorial playlists, such as *Today's Top Hits*. Major-label artists dominate these lists because their labels can buy visibility by leveraging industry relationships. Once featured, their tracks generate millions of streams,

---

[71] *Id.*

[72] Peter Knees et al., *Bias and Feedback Loops in Music Recommendation: Studies on Record Label Impact*, in Proceedings of the MORS Workshop at ACM RecSys'22 (2022), https://ceur-ws.org/Vol-3268/paper6.pdf (last visited October 16, 2025).

justifying renewed placement and cementing their dominance. What appears to be organic popularity is actually pay-for-play.

63.    The same bias infects Spotify's algorithmic recommendations. The system treats high stream counts as proof of popularity and promotes those tracks more frequently, even when the numbers are inflated by paid promotion.[73] It then compounds the distortion by interpreting passive listening—such as when a user is exercising—as genuine interest, reinforcing those same commercially driven tracks and embedding bias into the user's personalized recommendations.

## V.    Why Personalization Matters to Consumers.

64.    Spotify advertises its products as personalized because it knows consumers care about personalization. Research shows that 71% of consumers expect companies to deliver personalized interactions, and 76% report frustration when those expectations are not met.[74]

65.    Psychological factors further underscore why personalization matters. Research on "psychological ownership" demonstrates that when consumers feel a product or service is "mine" or "belongs to me," they form stronger attachments and expectations.[75] The digitalization of music has amplified this effect: listeners increasingly experience their personalized playlists as something they own.[76]

---

[73]    *Understanding Recommendations*, Spotify Safety & Privacy, https://www.spotify.com/us/safety-andprivacy/understanding-recommendations (last visited October 16, 2025).

[74]    *The Value of Getting Personalization Right—or Wrong Is Multiplying*, McKinsey (Nov. 12, 2021), https://www.mckinsey.com/capabilities/growth-marketing-and-sales/our-insights/the-value-of-getting-personalization-right-or-wrong-is-multiplying (last visited October 16, 2025).

[75]    Gedas Kučinskas, *Consumer Responses to Diverse Digital Goods: The Role of Psychological Ownership in Life Planning Apps, Music Streaming Services, and Game Skins*, 5 J. Industrial Eng'g & Mgmt. Research 529 (2024), available at https://www.jiemar.org/index.php/jiemar/article/view/529 (last visited October 16, 2025); *see also* Sabin Sharma, *Marketing in the Digital Age – Adapting to Changing Consumer Behavior*, 2 Int'l J. Mgmt. & Bus. Intelligence 1 (2024), available at https://penerbitjurnalinter-nasional.com/index.php/ijmbi/article/view/369 (last visited October 16, 2025).

[76]    *Id.*

66.    At the same time, consumers are significantly less likely to trust a recommendation once they perceive it as commercially motivated. Studies consistently show that willingness to accept recommendations declines when users believe those recommendations are biased by sponsorship.[77] Research confirms a marked drop in user acceptance when an advertisement is recognized as sponsored rather than organic.[78]

67.    This reaction is predictable. Once consumers recognize a message as advertising, they activate persuasion knowledge and evaluate it more critically.[79] That recognition triggers heightened skepticism, negative brand attitudes, and reduced purchase intentions.[80]  As a result, consumers are less likely to trust recommendations they perceive as biased by sponsorship.[81]

68.    These concerns are not theoretical. Spotify users frequently voice frustration with the platform's recommendations. One writer explained why she finally left Spotify: "I stopped listening to the music I actually wanted to listen to, and instead . . . embraced the music that Spotify

---

[77] Joeran Beel, Stefan Langer & Marcel Genzmehr, *Sponsored vs. Organic (Research Paper) Recommendations and the Impact of Labeling*, in Proceedings of the 17th Int'l Conf. on Theory and Practice of Digital Libraries (TPDL 2013), Lecture Notes in Computer Science 8092, 391–395 (2013), available at https://docear.org/papers/sponsored_vs._organic_(research_paper)_recommendations_and_the_impact_of_labeling. pdf (last visited October 16, 2025).

[78] *Id.*

[79] Matthijs van Reijmersdal, Esther Rozendaal, Michelle Boerman & Nanne Kruikemeier, *A Meta-Analysis of the Effects of Disclosing Sponsored Content*, 49 J. Advertising 344 (2020), available at https://www.researchgate.net/publication/342404511_A_Meta-Analysis_of_the_Effects_of_Disclosing-_Sponsored_Content (last visited October 16, 2025).

[80] Eva A. van Reijmersdal, Eline Brussee, Nathaniel Evans & Bartosz W. Wojdynski, D*isclosure-Driven Recognition of Native Advertising: A Test of Two Competing Mechanisms*, 23 J. Interactive Advert. 85 (2023), available at https://www.tandfonline.com/doi/full/10.1080/15252019.2022.2146991 (last visited October 14, 2025); *see also* Sophie C. Boerman, Eva A. van Reijmersdal & Peter C. Neijens, *Sponsorship Disclosure: Effects of Duration on Persuasion Knowledge and Brand Responses*, 62 J. Comm. 1047 (2012), available at https://www.researchgate.net/publication/257143519_Sponsorship_Disclosure_-_Effects_of_Duration_on_Persuasion_Knowledge_and_Brand_Responses?__cf_chl_tk=QrwLt3LLsRADSUTObdyq _7sPOTsd4mvPPyewer5890M-1760468488-1.0.1.1-ajg3M5tSW1awfeH_dC8.hBFbIQer9-lMzFDp.THd6Dx0   (last visited October 16, 2025).

[81] Weiquan Wang, Jingjun (David) Xu & May Wang, *Effects of Recommendation Neutrality and Sponsorship Disclosure on Trust vs. Distrust in Online Recommendation Agents: Moderating Role of Explanations for Organic Recommendations*, 64 Mgmt. Sci. 5198 (Nov. 2018), available at https://pubsonline.informs.org/doi/10.1287/mnsc.2017.2906 (last visited October 16, 2025).

told me I wanted to listen to."[82] Others echo that sentiment, lamenting that the app keeps "playing me the same songs over and over again,"[83] or complaining that "I get the same songs repeatedly."[84]

69.    Spotify's insistence on replaying the same songs—irrespective of genre or a user's listening history—has even fueled conspiracy theories. The "Espresso" conspiracy theory, for example, spread widely in 2024 with listeners suggesting that Sabrina Carpenter's label struck a deal with Spotify to "force-feed" her music by inserting Espresso into queues regardless of genre or taste—even for people who had never listened to her.[85] Reports described users playing reggaeton, post-punk, or hip-hop, only to be recommended the unrelated pop singles Espresso or Please Please Please by Carpenter.[86]

70.    But the fact that Spotify repeatedly pushes the same major-label tracks is no conspiracy theory. Spotify admits it engages in pay-for-play through its "Discovery Mode," which promotes songs in exchange for artists accepting reduced royalties. Likewise, executives at major record labels boast that their artists will outperform others regardless of organic listener interest— a reality borne out by empirical evidence.[87]

---

[82]    Amanda    Silberling,    *Why    I    Finally    Left    Spotify*,    TechCrunch    (Aug.    13,    2025), https://techcrunch.com/2025/08/13/why-i-finally-left-spotify/ (last visited October 16, 2025).

[83]    Shaad D'Souza, *The Music Industry Is Engineering Artist Popularity — Listeners Are Right to Be Angry*, The Guardian (July 29, 2024), https://www.theguardian.com/music/article/2024/jul/29/the-music-industry-is-engineering-artist-popularity-and-listeners-are-right-to-be-angry (last visited October 16, 2025).

[84]    Zoe Lambourne, *Help, I'm in a Spotify Echo Chamber!*, Medium (Apr. 27, 2024), https://medium.com/@zoe.lambournefreelancewriter/help-im-in-a-spotify-echo-chamber-7f7dedc67a6e (last visited October 16, 2025).

[85]    Rebecca Jennings, *The Spotify Conspiracy Theories about "Espresso," Explained*, Vox (July 1, 2024), https://www.vox.com/culture/357907/spotify-sabrina-carpenter-espresso-chappell-roan-algorithm    (last    visited October 16, 2025).

[86]    *D'Souza, supra* note 79; *see also* Billie Schwab Dunn, *Sabrina Carpenter Theory Takes Internet By Storm*, Newsweek (June 17, 2024), https://www.newsweek.com/sabrina-carpenter-theory-takes-internet-storm-1913633 (last visited October 16, 2025); Amy Davidson, *Why Is Sabrina Carpenter's 'Espresso' Taking Over Spotify Algorithms?,* NME (May 21, 2024), https://www.nme.com/features/music-features/espresso-sabrina-carpenter-spotify-streaming-3757741 (last visited October 16, 2025).

[87]    *Stassen, supra* note 47.

## VI.    The Implied Promise of Playlist Placement.

71.    Despite the pay-for-play nature of Spotify's algorithmic and editorial playlists—particularly its "Discovery Mode"—industry insiders have suggested that this conduct is *technically* legal because the FCC's jurisdiction does not extend to streaming platforms and the broadcast payola laws therefore do not apply. But legality under the Communications Act does not make the conduct lawful.[88]

72.    While the practice of pay-for-play has never been *per se* illegal,[89] Congress and federal regulators have long recognized that ***undisclosed*** pay-for-play is deceptive and inflicts an informational injury on consumers.

73.    Today, playlist placement—like radio airplay before it—carries an implied promise that a track was selected organically, based on editorial judgment or user preferences, not because of hidden commercial influence. Undisclosed pay-for-play undermines that expectation by substituting biased, financially driven selections for authentic, organic recommendations, thereby deceiving consumers.

74.    And because playlist placement functions as an implied endorsement, Spotify's undisclosed commercial arrangements fall squarely within the FTC's Endorsement Guides,[90] which require disclosure of material connections between endorsers and advertisers.

---

[88] Taylor Lambert & Kevin Erickson, *Music Recommendation and Digital Payola*, Future of Music Coalition (June 10, 2014, 8:48 AM), http://futureofmusic.org/blog/2014/06/10/music-recommendation-digital-payola, [https://perma.cc/DG8WDBTB]; *see also* Robert Cookson, *Spotify Bans "Payola" on Playlists*, Financial Times (Aug. 20, 2016), https://www.ft.com/content/af1728ca-4740-11e5-af2f-4d6e0e5eda22, [https://perma.cc/44GF-838W] ("The rise of music streaming services—which fall outside laws against payola on radio—has created a new opportunity for unscrupulous record promoters.").

[89] 47 U.S.C. § 508.

[90] FTC's *Guides Concerning the Use of Endorsements and Testimonials in Advertising*, 16 C.F.R. 255 (2023) ("Endorsement Guides").

**A.    Playlist placement carries the same implied endorsement as radio airplay.**

75.    For decades, radio playlists have carried an implied representation that a song's airtime reflects editorial judgment or genuine audience interest—not paid influence. Each time a new form of payola has emerged to distort that relationship, regulators have intervened to restore the integrity of those recommendations.[91]

76.    Nearly a century ago, the National Recovery Administration condemned undisclosed payola as a deceptive trade practice. Decades later, Congress reached the same conclusion, finding that secret promotional payments misled the public and distorted fair competition. And in the mid-2000s, the New York Attorney General brought enforcement actions against major record labels and radio conglomerates for similar pay-for-play schemes, again recognizing that undisclosed commercial influence deceives consumers.

77.    Across every era and medium, the principle has remained constant: when consumers are not told that recommendations are shaped by commercial incentives, the practice is deceptive.

78.    Spotify's playlists are no different. Whether curated by editors or generated by algorithms, playlist placement carries the same implied message that has long defined music discovery—that a track was chosen organically, based on authentic editorial or listener-driven factors, not hidden commercial influence. Just as a DJ's spin implied endorsement, a song's appearance on a Spotify playlist conveys the impression of an unbiased recommendation rather than a paid placement.

79.    Undisclosed pay-for-play corrupts that signal. When commercial incentives—not organic popularity, curation, or personalization—determine what listeners hear, the implied

---

[91] *See supra* Section I.

endorsement is false. Spotify's system thereby mirrors the very practices regulators condemned in the vaudeville and radio era: a hidden substitution of commercial interests for organic, unbiased recommendation.

80.    The fact that a song's placement on a playlist is driven by commercial influence is material to consumers. It is one of the many "more-or-less sentimental considerations that the ordinary man regards as important."[92]

**B.    Undisclosed pay-for-play violates the FTC's Endorsement Guides.**

81.    Spotify's undisclosed payola violates the FTC's Endorsement Guides. These Guides govern both affirmative statements and omissions made in connection with endorsements, which are treated identically under the law.[93] The FTC defines an endorsement broadly as "any advertising message . . . that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed are identical to the sponsoring advertiser."[94] The FTC has applied this expansive definition in contexts as subtle as a social media user tagging a brand in a post—requiring disclosure if that user has a financial relationship with the brand.[95]

82.    Under the Endorsement Guides, any "material connection" between an endorser and a seller must be disclosed if it might affect the credibility or weight of the endorsement and

---

[92] Letter from James C. Miller III, Chair, FTC, to Rep. John D. Dingell, Chairman, Committee on Energy and Commerce, (October 14, 1983) (containing the FTC Policy Statement on Deception), available at https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf), [https://perma.cc/5N49-KHUQ] (last visited October 14, 2025), citing Restatement (Second) of Torts § 538(2) cmt. on cl. 2(a)(d).

[93] 16 C.F.R. § 255.1(a)–(d).

[94] 16 C.F.R. § 255.0(b).

[95] *See* Decision and Order at 4-5, *Lord & Taylor, LLC*, No. C-4576 (F.T.C. May 20, 2016), File No. 125-3181, available at https://www.ftc.gov/system/files/documents/cases/160523lordtaylordo.pdf (last accessed Nov. 4, 2025).

would not reasonably be expected by the audience.[96] Payment or other consideration for an endorsement triggers a duty to disclose that relationship "clearly and conspicuously."[97]

83.     By allowing commercial considerations to dictate playlist placement, Spotify presents those tracks as organically selected—reflecting genuine listener preferences or editorial judgment—while concealing that hidden financial incentives, not independent curation or algorithmic judgment, drive their inclusion.

84.     The source and authenticity of playlist placement are material to consumers.[98] Spotify markets its playlists as trusted, data-driven reflections of individual taste and popularity, and consumers rely on that representation in choosing what to listen to, purchase, and share. Whether a track appears because of merit or because of undisclosed payment directly affects the perceived credibility and value of the recommendation.

85.     This practice mirrors the payola scandals of the 1930's, 1960's and early 2000's.[99] Then, too, the deception did not depend on DJs explicitly proclaiming a record the "best," but on the implied endorsement carried by airtime itself. Regulators, including Congress, the FTC, the FCC, and state attorneys general, uniformly recognized that playing a song on the radio for undisclosed commercial reasons violated consumer trust.

86.     Today, playlists function as the modern equivalent of radio airplay: they are the gatekeepers of exposure and the primary discovery mechanism for new music. Whether a DJ spinning a record or Spotify's editors and algorithms adding a track to "RapCaviar," consumers reasonably believe placement reflects organic listener preference rather than financial influence.

---

[96] 16 C.F.R. § 255.5.

[97] *Id*.

[98] *See supra* Sections I, V-VI(A).

[99] *See supra* Section I.

87.    If hidden commercial incentives secretly drive that placement, the trust underpinning the platform is compromised in precisely the same way as traditional payola—an outcome the FTC's Endorsement Guides were designed to prevent.

## PLAINTIFF'S EXPERIENCES

88.    Plaintiff Genevieve Capolongo first purchased her Spotify subscription in approximately September 2023, in New York, New York. Plaintiff has maintained a Spotify account and routinely listened to music through Spotify's platform, including its curated playlists such as Release Radar, Discover Weekly, her AI DJ, and other editorial and algorithmic playlists that Spotify advertised as neutral and personalized.

89.    Plaintiff has long preferred music outside of the mainstream, including independent and lesser-known artists such as Próxima Parada, Julia Cooper, and Brusco. Yet despite her listening history, Spotify continually recommended and pushed mainstream, major-label tracks that did not reflect her tastes such as Drake, Zach Bryan, and Justin Bieber. These recommendations were delivered through playlists and features Spotify advertised as "personalized" and "based on your listening habits."

90.    In deciding to use and continue paying for Spotify, Plaintiff saw and relied upon Spotify's representations—including those in the app-store—touting that its playlists and recommendations were tailored to her individual tastes and reflected her listening preferences. Spotify's marketing repeatedly assured users like Plaintiff that its playlists were "personalized," "made just for you," and "based on your listening habits." Plaintiff relied on these advertisements and reasonably understood them to mean that playlist placement and recommendations were free of undisclosed commercial bias.

91.    Plaintiff relied on these assurances before first purchasing her subscription. Plaintiff further relied on these assurances each time she renewed her subscription, reasonably believing that she was continuing to pay for a service that provided neutral and genuinely personalized recommendations.

92.    Plaintiff suffered injury in that she would not have paid for Spotify's service—or would have paid less—had she known the truth: that Spotify's playlists and recommendations are shaped by undisclosed pay-for-play arrangements and hidden commercial incentives, not by her listening history alone. Plaintiff also suffered injury in that Spotify misused her personal data to generate algorithmic outputs that served its own commercial interests rather than providing the neutral and personalized recommendations it promised.

93.    Plaintiff continues to use and pay for Spotify's service. It would not be reasonable to expect her to cancel her subscription, as doing so would involve significant switching costs, including the loss of playlists and downloads accumulated over years of use.

94.    Despite knowing that Spotify's representations about personalization were false, Plaintiff continues to suffer ongoing harm each time she uses the platform. She still cannot discern which songs are recommended for legitimate editorial or personalized reasons and which are promoted due to undisclosed commercial arrangements. As a result, Plaintiff remains deprived of the ability to make informed choices about the music she listens to and pays for, and she continues to be exposed to Spotify's deceptive conduct on a recurring basis.

## CLASS ALLEGATIONS

95.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other similarly situated individuals (the "Class"), defined as follows:

All persons in the United States who used Spotify during the applicable statute of limitations period.

96.    Excluded from the Class are any of Defendant's officers, directors, or employees; officers, directors, or employees of any entity in which Defendant currently has or has had a controlling interest; and Defendant's legal representatives, heirs, successors, and assigns.

97.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

98.    At this time, Plaintiff does not know the exact number of Class members; however, given the nature of the claims and the millions of Spotify users located throughout the United States, Plaintiff believes that the Class members are so numerous that joinder of all members is impracticable.

99.    There is a well-defined community of interest in the questions of law and fact involved in this case. The following questions of law and fact are common to the Class members and predominate over questions that may affect individual Class members, such as:

   a.    Whether Spotify misrepresented that its playlists and recommendations were neutral, merit-based, and personalized to users' tastes;

   b.    Whether Spotify's labeling, marketing, advertising, and/or promotion of its playlists and recommendation features constituted an unfair and/or deceptive trade practice;

   c.    Whether Spotify engaged in undisclosed pay-for-play arrangements, including through its "Discovery Mode" program, that influenced playlist placement and recommendations;

   d.    Whether Spotify misled Plaintiff and Class Members into believing that playlist placement and recommendations reflected popularity, quality, or personalization, rather than undisclosed commercial incentives;

   e.    Whether playlist placement constitutes an implied promise or endorsement that a track was selected because of its quality, popularity, or fit with the listener, independent of commercial influence;

    f.   Whether Spotify's undisclosed pay-for-play practices violate the Federal Trade Commission's Endorsement Guides;

    g.   Whether Spotify was unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Spotify to retain the benefits conferred upon it by Plaintiff and the other Class members; and

    h.   Whether Plaintiff and Class Members are entitled to monetary damages, restitution, or other relief, and if so, the proper measure of such damages.

100.    Plaintiff's claims are typical of those of the Class because Plaintiff, like all Class members, used Spotify in a typical consumer setting and was exposed to Spotify's representations that its playlists and recommendations were neutral, merit-based, and personalized. Plaintiff, like all Class members, sustained damages as a result of Spotify's undisclosed pay-for-play practices and misrepresentations.

101.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in litigating complex class actions. Plaintiff has no interests that conflict with those of the Class.

102.    The requirements of Fed. R. Civ. P. 23(b)(3) are met as common issues predominate over any individual issues, and treatment of this matter as a class action is superior to numerous individual actions.

103.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met, as Spotify has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

104.    Spotify's conduct is generally applicable to the Class as a whole and Plaintiff seeks, inter alia, equitable remedies with respect to the Class as a whole. As such, Spotify's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

105.    The litigation of separate actions by Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Spotify. For example, one court might enjoin Spotify from performing the challenged acts, whereas another might not. Additionally, individual actions may be dispositive of the interests of the Class, although certain Class members are not parties to such actions.

106.    Plaintiff and other Class Members have suffered damages as a result of Spotify's unlawful and wrongful conduct. Absent a class action, Spotify will retain substantial funds received as a result of its wrongdoing, and such unlawful and improper conduct shall, in large measure, not go remedied. Absent a class action, the members of the Class will not be able to effectively litigate these claims and will suffer further losses, as Spotify will be allowed to continue such conduct with impunity and retain the proceeds of its ill-gotten gains.

## CAUSES OF ACTION

### COUNT ONE
**Violation of New York General Business Law § 349**
**(Deceptive Acts and Practices)**

107.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

108.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

109.    Spotify engaged in deceptive acts and practices in violation of GBL § 349 by misrepresenting that its playlists and recommendations were neutral, merit-based, and personalized to users' tastes, when in reality they were shaped by undisclosed commercial incentives and pay-for-play arrangements.

110.    Spotify further engaged in deceptive practices by marketing its playlists as "personalized," "made just for you," and "based on your listening habits" while concealing that

major-label tracks and commercially prioritized songs would be favored regardless of user preference.

111.    Consumers also have a longstanding and independent interest in knowing whether music recommendations are being made for artistic or commercial reasons. For more than a century, regulators and the public have condemned undisclosed payola precisely because hidden sponsorship deceives listeners about the basis for recommendations. Just as each prior generation of consumers had a right to know whether radio spins were purchased or earned, today's listeners reasonably expect to know whether Spotify's playlists reflect merit and personalization or undisclosed financial arrangements.

112.    These facts are material because a reasonable consumer would attach importance to whether recommendations are commercially motivated when deciding whether, and how much, to pay for Spotify's service.

113.    Spotify's conduct is also deceptive in light of the FTC's Endorsement Guides. 16 C.F.R. § 255.[100] An "endorsement" is defined broadly as "any advertising message . . . that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser."

114.    Playlist placement falls squarely within this definition: when Spotify curators or algorithms recommend a track, consumers reasonably believe that the placement reflects the judgment of Spotify as an independent tastemaker or neutral recommender, rather than a hidden commercial arrangement.

---

[100] Plaintiff does not seek to enforce the Guides themselves; instead, they are cited to provide context regarding the FTC's view that undisclosed commercial influence constitutes deception.

115.    Because playlist placement constitutes an endorsement, Spotify's failure to disclose its commercial interests is a material omission that deceives reasonable consumers about the weight and credibility of its recommendations.

116.    Under the Endorsement Guides, any "material connection" between the endorser and the seller of the advertised product must be "clearly and conspicuously" disclosed if it might affect the weight or credibility of the endorsement and would not be reasonably expected by the audience. Spotify permits financial incentives and commercial considerations—including reduced royalty rates under its "Discovery Mode" program and preferential treatment of major-label tracks—to influence playlist placement and recommendations. Yet Spotify fails to disclose these material connections to listeners.

117.    By presenting playlist placement as a form of neutral personalization while concealing its own commercial interests, Spotify provides endorsements that are materially misleading and unlawful under the FTC's Endorsement Guides. This nondisclosure deprives consumers of information essential to evaluating whether a recommendation stems from artistic merit, user fit, or undisclosed commercial arrangements, and mirrors precisely the deceptive payola practices that regulators have long condemned as unlawful.

118.    These acts and omissions were materially misleading to a reasonable consumer and have been repeatedly recognized by regulators in analogous contexts—such as the FTC, FCC, and state attorneys general—as deceptive.

119.    Plaintiff and Class members suffered injury as a result of Spotify's deceptive practices. Plaintiff and Class members paid for a service they believed was neutral and personalized, and they were deprived of the benefit of that bargain. Plaintiff and Class members

also suffered informational injury by being denied truthful disclosures about commercial influence.

120.    In addition, Plaintiff and Class Members are suffering ongoing harm each time they use the service, as users cannot know whether playlists or algorithmic recommendations reflect genuine personalization or undisclosed commercial influence. Without a court order requiring Spotify to disclose when financial considerations determine playlist placement or recommendations, Plaintiff and Class Members will continue to be deprived of the ability to make informed choices about the music they consume and pay for.

121.    As a result of Defendant's unlawful actions, Plaintiff and Class members to enjoin Defendant's deceptive and unlawful acts and practices described herein and to recover actual damages, fifty dollars, or both, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

<u>**COUNT TWO**</u>
**Violation of New York General Business Law § 350**
**(False Advertising)**

122.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

123.    New York General Business Law § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

124.    Spotify engaged in false advertising by representing through its marketing, advertising, and in-app promotions that its playlists and recommendations were personalized, unbiased, and reflective of a user's listening preferences, when in fact playlist placement was influenced by undisclosed financial incentives and commercial arrangements.

125.    Spotify's advertisements and promotional statements, including claims that Spotify provides music "just for you," "personalized playlists," and "recommendations based on your

listening habits," were false and materially misleading to reasonable consumers, misleading, and likely to deceive reasonable consumers into believing that playlist placement reflected artistic merit or personalization rather than undisclosed commercial bias.

126.    Plaintiff and Class members reasonably relied upon Spotify's false advertising in deciding to subscribe to and use Spotify. Had Plaintiff and Class members known the truth, they would not have paid for the service or would have paid less. This reliance caused economic harm in the form of subscription payments made at an inflated price—representing a price premium for a service falsely advertised as neutral and personalized.

127.    In addition to this economic harm, Plaintiff and Class members suffered informational injury because Spotify's false advertising deprived them of truthful disclosures about whether commercial considerations shaped their playlists. Spotify's omissions denied consumers the ability to evaluate the credibility of its recommendations and to make informed decisions about the music they consume.

128.    In addition, Plaintiff and Class Members are suffering ongoing harm each time they use the service, as users cannot know whether playlists or algorithmic recommendations reflect genuine personalization or undisclosed commercial influence. Without a court order requiring Spotify to disclose when financial considerations determine playlist placement or recommendations, Plaintiff and Class Members will continue to be deprived of the ability to make informed choices about the music they consume and pay for.

129.    As a result of Defendant's unlawful action, Plaintiff and Class members seek to enjoin Defendant's deceptive and unlawful acts and practices described herein and to recover actual damages or five hundred dollars, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## COUNT THREE
### Fraudulent Inducement

130.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

131.    Spotify knowingly misled consumers about the nature of its platform to induce them to purchase and continue paying for its service. Through its marketing, website, and in-app representations, Spotify affirmatively represented that its playlists and recommendations were "personalized," "made just for you," and "based on your listening habits."

132.    These representations were false. Spotify's playlists and recommendations were not purely organic or driven by user preferences. Instead, Spotify secretly allowed undisclosed pay-for-play arrangements and other commercial incentives—such as its "Discovery Mode" program and major-label promotional deals—to dictate which tracks were recommended and when.

133.    Spotify knew these statements were false at the time it made them. The company admits elsewhere on its website that "commercial considerations may influence" playlist recommendations, but buries this disclosure deep within a subpage that no reasonable consumer would find. Spotify nonetheless continued to advertise its platform as "personalized" and "made just for you," knowing that consumers value authenticity in music recommendations and would rely on that assurance.

134.    Spotify made these misrepresentations with the intent that consumers would rely upon them when deciding to subscribe, renew, and continue paying for Spotify's service. Personalization was central to Spotify's marketing and to consumers' willingness to pay. Plaintiff and Class members reasonably relied on these representations in purchasing and renewing their subscriptions, believing that playlist placement reflected genuine personalization rather than hidden commercial influence. As a result, Plaintiff and Class members suffered economic injury

in the form of inflated subscription payments and informational injury from being deprived of truthful disclosures about the commercial nature of Spotify's recommendations.

135.    Spotify also fraudulently concealed material facts that it had an independent duty to disclose.

136.    Specifically, Spotify failed to disclose that its playlists and algorithmic recommendations were influenced by undisclosed pay-for-play practices—the digital equivalent of the "payola" scandals that Congress and federal regulators have long recognized as deceptive and unlawful.

137.    For nearly a century, lawmakers and regulators have condemned undisclosed payola as a "fraud upon the listening public." The National Recovery Administration denounced it in the 1930s; Congress criminalized it under the Communications Act amendments of 1960; and the Federal Trade Commission and state attorneys general again condemned it in the 2000s. Spotify's concealment of its modern pay-for-play scheme violates the same core principle: consumers have a right to know when the music they hear is promoted for commercial reasons rather than editorial or organic ones.

138.    Spotify had exclusive knowledge of these facts, actively concealed them, and made partial representations that playlists were "personalized" and "based on your listening habits" while omitting the truth that commercial incentives dictated recommendations. Spotify therefore had a duty to disclose the existence and nature of its pay-for-play practices. That duty is heightened here because Spotify not only deceived consumers about the basis for its recommendations but charged them for the privilege of being deceived.

139.    Consumers, including Plaintiff, care deeply about whether their music recommendations are organic or commercially influenced.

140.    Spotify's deception is particularly egregious because only Spotify knows which songs are being recommended for legitimate editorial or personalized reasons and which are promoted for commercial gain. By concealing this information, Spotify deprived users of the ability to make informed choices about the music they consume and pay for.

141.    Plaintiff and Class members relied on Spotify's concealment and omissions in continuing to use and pay for the service, believing that their playlists reflected genuine personalization.

142.    As a direct and proximate result, they suffered financial injury in the form of subscription payments made for a service that was not as represented, and informational injury from being denied truthful disclosure of Spotify's commercial incentives.

143.    Spotify's conduct was intentional, willful, and malicious, entitling Plaintiff and the Class to compensatory and punitive damages.

## COUNT FOUR
### Unjust Enrichment

144.    Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint and further alleges as follows:

145.    Plaintiff and the Class members conferred benefits on Defendant by paying subscription fees and allowing Spotify to use their data in exchange for using Spotify's music streaming service.

146.    Defendant had knowledge of these benefits, and voluntarily accepted and retained them.

147.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Class members' subscription payments.

148.    Retention of that money under these circumstances is unjust and inequitable because Defendant falsely and misleadingly represented, through its advertising and marketing, that its playlists and recommendations were neutral, merit-based, and personalized to users' tastes, when in fact they were shaped by undisclosed commercial incentives and pay-for-play arrangements.

149.    These misrepresentations and omissions caused injury to Plaintiff and the Class because they would not have subscribed to Spotify, or would not have paid as much for the service, had they known that playlists and recommendations were influenced by hidden financial incentives rather than solely by personalization or quality.

150.    Because Defendant's retention of the non-gratuitous benefits conferred to it by Plaintiff and the Class members is unjust and inequitable, Defendant ought to pay restitution to Plaintiff and the Class members for its unjust enrichment.

151.    As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and the Class members are entitled to restitution or disgorgement in an amount to be determined at trial.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of all Class members and all others similarly situated, prays for relief as follows:

A.    An order certifying the proposed Class; appointing Plaintiff as representative of the Class; and appointing Plaintiff's undersigned counsel as Class counsel;

B.    A declaration that Spotify is financially responsible for notifying Class members of the pendency of this suit;

C.    An award of restitution for Class members;

D.    An award of disgorgement of all ill-gotten gains derived from Spotify's unlawful conduct;

E.    An order enjoining Spotify's unlawful and deceptive acts and practices, including but not limited to: (a) permitting undisclosed pay-for-play arrangements to dictate playlist placement and recommendations; (b) marketing playlists and recommendations as neutral, merit-based, or "personalized" when they are influenced by hidden commercial incentives; and (c) failing to disclose material connections as required by the Federal Trade Commission's Endorsement Guides;

F.    Injunctive relief requiring Spotify to clearly and conspicuously disclose when playlist placement or recommendations are influenced by paid promotion or other commercial considerations;

G.    Actual damages for Class members;

H.    Statutory damages in the maximum amount provided by law;

I.    Punitive damages in accordance with proof and in an amount consistent with applicable precedent;

J.    An order awarding Plaintiff and other Class members the reasonable costs and expenses of this suit, including attorneys' fees; and

K.    Such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all claims so triable.

Dated: November 4, 2025

**FARUQI & FARUQI, LLP**

By:  _/s/ Innessa M. Huot_
Innessa M. Huot

685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
ihuot@faruqilaw.com

**STEPHAN ZOURAS, LLC**
James B. Zouras (*Pro Hac Vice forthcoming*)
Ryan F. Stephan (*Pro Hac Vice forthcoming*)
Justin M. Caparco (*Pro Hoc Vice forthcoming*)
STEPHAN ZOURAS, LLC
222 West Adams Street, Suite 2020
Chicago, Illinois 60606

Telephone: (312) 233-1550
jzouras@stephanzouras.com
rstephan@stephanzouras.com
jcaparco@stephanzouras.com